APPALACHIAN RACING, LLC, Churchill Downs Incorporated, Ellis Park Race Course, Inc., Keeneland Association Inc., Kentucky Downs, LLC, Players Bluegrass Downs, Inc., Lexington Trots Breeders Association, LLC, and Turfway Park, LLC, Appellants

v.

The FAMILY TRUST FOUNDATION OF KENTUCKY, INC., d/b/a the Family Foundation, the Kentucky Horse Racing Commission, and Kentucky Department of Revenue, Appellees

and

The Kentucky Department of Revenue, Appellant

v.

The Family Trust Foundation of Kentucky, Inc., d/b/a the Family Foundation, the Kentucky Horse Racing Commission, Appalachian Racing, LLC, Churchill Downs Incorporated, Ellis Park Race Course, Inc., Keeneland Association Inc., Kentucky Downs, LLC, Players Bluegrass Downs, Inc., Lexington Trots Breeders Association, LLC, and Turfway Park, LLC, Appellees

and

The Kentucky Horse Racing Commission, Appellant

v.

The Family Trust Foundation of Kentucky, Inc., d/b/a the Family Foundation, the Kentucky Department of Revenue, Appalachian Racing, LLC, Churchill Downs Incorporated, Ellis Park Race Course, Inc., Keeneland Association Inc., Kentucky Downs, LLC, Players Bluegrass Downs, Inc., Lexington Trots Breeders Association, LLC, and Turfway Park, LLC, Appellees.

Nos. 2012–SC–000414–DG, 2012–SC–000415–DG, 2012–SC–000416–DG.

Supreme Court of Kentucky.

Feb. 20, 2014.

William A. Hoskins, III, Jay Edward Ingle, Lexington, Counsel for Appalachian Racing, LLC, Ellis Park Race Course, Inc., Kentucky Downs, LLC, and Lexington Trots Breeders Association, LLC.

Sheryl G. Snyder, Jason Patrick Renzelmann, Louisville, Counsel for Churchill Downs Incorporated.

William M. Lear, Jr., Shannon Bishop Arvin, Christopher L. Thacker, Lexington, Counsel for Keeneland Association, Inc., Players Bluegrass Downs, Inc., and Turfway Park, LLC.

Stanton L. Cave, Lexington, Counsel for Family Trust Foundation of Kentucky, Inc., d/b/a the Family Foundation.

Peter Frank Ervin, Louisville, Susan Bryson Speckert, Lexington, Gordon Ray Slone, Frankfort, La Tasha Arnae Buckner, Counsel for the Kentucky Horse Racing Commission.

Douglas M. Dowell, Eugene Jeffrey Mosley, Laura Marie Ferguson, Frankfort, Counsel for Kentucky Department of Revenue.

Opinion of the Court by Justice VENTERS.

We granted discretionary review in this case to consider whether the Kentucky Horse Racing Commission (the Commission) has the statutory authority to license the operation of mechanical and electronic devices for wagering on previously run horse races, so called "historical horse racing"; to consider whether the Kentucky Department of Revenue (the Department) has the statutory authority to tax the wagering upon historical horse races; and to consider whether the licensed operation of wagering on historic horse racing, pursuant to the Commission's authority, violates the gambling provisions of the Kentucky Penal Code. In a summary proceeding, the Franklin Circuit Court answered the first two of the foregoing questions in the affirmative, and the third in the negative, as

matters of law. The Court of Appeals reversed that decision and remanded the case to the Franklin Circuit Court to enable the parties to undertake discovery procedures to more fully develop a record of facts relevant to the wagering on historic horse racing.

For the reasons set forth below, we affirm the Court of Appeals, in part, and we reverse the Court of Appeals, in part. Specifically, we conclude that: 1) the Commission has the statutory authority to license and regulate the operation of pari-mutuel wagering on historic horse racing; 2) under the present statutory scheme for taxing the wagering handle on horse racing in Kentucky, the Department does not have the authority to collect the statutory excise tax on the wagering on historic horse races; and 3) whether the licensed operation of wagering on historic horse racing, pursuant to the Commission's authority, violates the gambling provisions of the Kentucky Penal Code is an issue that depends upon facts not in the record, and therefore, must be deferred pending further proceedings in the circuit court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellants herein are the Commission and the Department, and eight horse racing associations (the Associations)[1] in Kentucky that would like to expand their businesses to include wagering upon historical horse racing. The Appellee is The Family Trust Foundation of Kentucky, Inc., also known as The Family Foundation (the Foundation), a Kentucky non-profit corporation, which the trial court permitted to intervene in the action without objection by the Appellants.

Faced with serious financial challenges and seeking a means to develop new revenue sources, Kentucky's horse racing industry expressed interest in developing the use of devices for wagering on historical horse races. Historical horse races are horse races that have been run sometime in the past at an approved racing facility and are then currently presented in the form of a video display on an electronic device, or terminal, at which individual wagerers may place bets.[2] One such device, similar in appearance to a slot-machine, is a patented product marketed under the name "Instant Racing." The bettor inserts money or its equivalent into the Instant Racing terminal and then chooses a horse identified by a number. The terminal then displays a video recording of the race for the better to watch, or, as the name "Instant Racing" implies, the bettor may forego the excitement of the actual race by opting to see immediately the results of the race and the outcome of his wager. Bettors are not given information from which they might identify the specific time and place of the actual running of the race, or the identity of the horse, but some statistical data regarding the horses is provided for bettors who wish to place their bets with some degree of deliberation.

Proponents of historical horse racing promoted legislation introduced in the 2010 General Assembly that would have explicitly authorized the licensed operation

---

1. The eight racing associations are Appalachian Racing, LLC; Churchill Downs Incorporated; Ellis Park Race Course, Inc.; Keeneland Association, Inc.; Kentucky Downs, LLC; Lexington Trots Breeders Association, LLC; Players Bluegrass Downs, Inc.; and Turfway Park, LLC.

2. As defined in the regulations which are the subject of this action, 810 KAR 1:001(30), "Historical horse race" means any horse race that: (a) Was previously run at a licensed pari-mutuel facility located in the United States; (b) Concluded with official results; and (c) Concluded without scratches, disqualifications, or dead-heat finishes.

of such non-traditional forms of horse racing and horse race wagering. However, the proposed legislation was not enacted into law. Following the 2010 legislative session, in July 2010, the Commission promulgated a series of regulatory changes designed to accommodate the industry's request for expanded wagering by way of "terminals" displaying video recordings of prior races.[3]

These regulatory changes prescribe the rules by which the wagering on historical races shall be conducted, but the most critical element of the regulations is the requirement that all such wagering must be "pari-mutuel." That is so because, pursuant to KRS 230.215 and KRS 230.361, any wagering on horse racing in Kentucky must be based upon a pari-mutuel system. In other words, the Commission has no authority to license an operation for wagering on horse racing that is not utilizing a form of pari-mutuel wagering.

In conjunction with the Commission's new regulations to license the use of devices for wagering on historical horse racing, the Department amended its regulations and revised its applicable tax forms so that wagering on historical horse racing, like other forms of horse racing in Kentucky, would be subject to the excise tax set forth in KRS 138.510(1).

Together, as Joint–Petitioners, Appellants filed an action for a declaration of rights in the Franklin Circuit Court as an "agreed case" pursuant to KRS 418.020. The Petition requested the court to declare that:

1. the Racing Commission's adoption of new regulations to license the operation of pari-mutuel wagering on "historical horse racing" was a valid and lawful exercise of the Commission's statutory authority under KRS Chapter 230; and,

2. the licensed operation of pari-mutuel wagering on historical horse races pursuant to the new regulations did not violate the gambling prohibitions of KRS Chapter 528 because they fit within the pari-mutuel wagering exemption of KRS 436.480; and,

3. the Department's amended regulation and tax form requiring the payment of the excise tax on the revenue generated from wagering on historical horse racing was a valid and lawful exercise of its statutory authority.

There was no Respondent or opposing party named in the Petition.

A few days after the filing of the Petition, the trial court determined, *sua sponte*, that the case presented a justiciable controversy. The court directed Appellants to submit briefs on the matter. Soon afterwards, the Foundation intervened in the action and challenged both the validity of the new administrative regulations and the premise that wagering on historical horse racing, as allowed in the new regulations and as argued by the Associations, was truly pari-mutuel wagering. The Foundation also attempted to engage in pretrial discovery to develop the information it deemed pertinent to the issues pending before the court.

**3.** The Commission's regulatory scheme for horse racing provides three separate but substantially similar sets of regulations for three kinds of horse racing: Thoroughbred racing (810 KAR 1:001–1:150); Harness racing (811 KAR 1:005–1:290); and Quarter Horse, Appaloosa and Arabian Racing (811 KAR 2:010–2:200). The July, 2010, amendments provided, within each set, a new provision allowing for historical race wagering (810 KAR 1:120, 811 KAR 1:250, and 811 KAR 2:160). The July, 2010, changes also amended the definition sections within each set (810 KAR 1:001, 811 KAR 1:125; 811 KAR 2:060) and the pari-mutuel wagering section within each set (810 KAR 1:120; 811 KAR 1:250; 811 KAR 2:160) to accommodate historical racing of the respective breeds.

The Franklin Circuit Court denied the Foundation's request to conduct discovery, and ultimately entered judgment as requested by Appellants declaring: 1) that the Commission's regulations for licensing the operation of pari-mutuel racing on historical horse racing were valid; 2) that the Department's move to collect the excise tax on wagering on historical racing was valid; and 3) that the licensed operation of historical racing devices pursuant to the Commission's new regulations did not violate the prohibitions on gambling as contained in KRS Chapter 528. The Foundation appealed.

Although the Court of Appeals affirmed the trial court's conclusion that the case presented a justiciable controversy, it further concluded that the Foundation should have had the opportunity to use the conventional discovery processes to "develop proof and to present evidence." Because the trial court had blocked the effort to develop such proof through discovery, the Court of Appeals vacated the judgment and remanded the case to the Franklin Circuit Court. We granted discretionary review. Appellants contend that the Court of Appeals erred in its conclusion that the Foundation had the right to conduct discovery pursuant to the Rules of Civil Procedure and that, as a matter of law, it should have affirmed the circuit court's ruling.

The Court of Appeals did not address the substance of the three questions presented in the Petition because it regarded all of them as dependent upon additional factual development and subject to the discovery procedures provided in the Rules of Civil Procedure. We agree for reasons explained below that the second question presented in the Petition—whether wagering operations conducted pursuant to the new regulations would violate the gambling prohibitions of KRS Chapter 528—cannot be answered without the consideration of additional factual information presented in the form of evidence. Therefore, we agree with the Court of Appeals that the Foundation was entitled to a reasonable opportunity to discover further facts relevant to this issue.

However, the questions of whether the Commission and the Department are statutorily authorized to license, regulate, and tax wagering on historical horse racing are governed exclusively by the applicable statutes, and therefore should be addressed as matters of law. A proper analysis and just determination of those questions does not involve the resolution of any additional factual issues, but requires only the examination and interpretation of the applicable law.

Consequently, we affirm the opinion of the Court of Appeals insofar as its decision remanded the second question (whether there is a violation of KRS Chapter 528) to the circuit court for the parties to conduct appropriate discovery pending further proceedings. We reverse the Court of Appeals insofar as it remanded for further proceedings regarding the questions pertaining to the validity of the subject regulations as being within the statutorily authorized regulatory power of the Commission. We directly address those questions below. We begin, however, with discussion of the threshold matter of justiciability, an issue that clearly vexed both the Franklin Circuit Court and the Court of Appeals, and, because of conflicting and doubtful precedent, requires our timely attention.

## II. JUSTICIABILITY AND KRS 418.020

Section 112(5) of the Kentucky Constitution grants the circuit court juris-

diction only of "justiciable causes."[4] The constitutional validity of the declaratory judgment process, especially actions brought under KRS 418.020 as an agreed case, hinges upon the existence of a "real" controversy.[5]

The Petition asserted that the Associations faced an "immediate and pressing need" for resolution of the matters so they could: 1) reasonably assess the propriety of making a substantial financial investment in the new wagering "terminals" for historical horse racing; and 2) avoid the risk of criminal culpability if such wagering was determined to violate the gambling provisions of the Kentucky Penal Code. The Appellants, named in their Petition as "Joint–Petitioners," with no identified "Respondent," presented the action as an agreed case pursuant to KRS 418.020, rather than the more common type of declaratory judgment action brought under KRS 418.040.[6]

In the Petition, the Horse Racing Commission and the Department of Revenue expressed mutual support for the new regulations, which they claimed would improve the economic prospects of the racing industry and generate revenue for the state. The Associations also expressed support for the new regulations, which would enable them to implement pari-mutuel wagering on historical horse racing. It is apparent from the Petition that all of the Joint–Petitioners shared a common interest in sustaining the ability to license, conduct, and tax pari-mutuel wagering on historical horse racing.

Before the intervention of the Foundation, and without antagonistic parties to present both sides of the controversy, the trial court recognized that there was a threshold question of justiciability. It correctly noted in its initial order setting the briefing schedule, that "the existence of a justiciable controversy ... is a prerequisite to declaratory relief" under KRS Chapter 418. Based upon the Court of Appeals' decision in *McConnell v. Commonwealth*, 655 S.W.2d 43 (Ky.App.1983), the trial court resolved its concern by allowing the case to proceed. According to *McConnell*, a controversy may be deemed to be justiciable "when an advance determination would eliminate or minimize the risk of wrong action or mistakes by any of the parties" and "despite the absence of designated antagonistic parties, the issue has immediacy and a useful public purpose [that] can be served by a judicial adjudication." *Id.* at 45–46. After intervening as a party, the Foundation challenged the justiciability of the case but the trial court declined to revisit the issue.

4. Ky. Const. § 112(5) states: "The Circuit Court shall have original jurisdiction of all justiciable causes not vested in some other court. It shall have such appellate jurisdiction as may be provided by law."

5. KRS 418.020, entitled "Agreed case may be submitted to court; affidavit; proceedings," provides:

Parties to a question which might be the subject of a civil action may, without action, state the question and the facts upon which it depends, and present a submission thereof to any court which would have jurisdiction if an action had been brought. But it must appear by affidavit that the controversy is real, and the proceedings in good faith, to determine the rights of the parties. The court shall, thereupon, hear and determine the case, and render judgment as if an action were pending.

6. KRS 418.040 provides:

In any action in a court of record of this Commonwealth having general jurisdiction wherein it is made to appear that an actual controversy exists, the plaintiff may ask for a declaration of rights, either alone or with other relief; and the court may make a binding declaration of rights, whether or not consequential relief is or could be asked.

On appeal, the Court of Appeals acknowledged that it was "gravely concerned" about the wisdom of a process that provides for judicial approval of a matter based solely upon statements of parties having no adverse interests at stake. However, also citing *McConnell,* the Court of Appeals concluded that the dubious process "seems to be precisely what KRS 418.020 allows."

We share the Court of Appeals' concern about the wisdom of *McConnell*'s interpretation of justiciability. However, in the final analysis, we agree with the Court of Appeals that the Foundation's intervention in the action, vigorously challenging Appellants' positions, provided a true antagonistic interest, thereby eliminating any doubt about the case's justiciability. Further, because of its constitutional significance and likelihood of recurrence, we believe a discussion of the question, and the ongoing viability of *McConnell,* is appropriate.

We note that *McConnell,* an opinion of the Court of Appeals that has never been cited by this Court, runs contrary to long-established and well-settled authorities holding that the presence of adverse parties is a prerequisite for justiciability. This Court and our predecessor court have consistently held that declaratory judgment statutes are available to resolve "only rights and duties about which there is *a present actual controversy presented by adversary parties,* and in which a binding judgment concluding the controversy may be entered." *Black v. Elkhorn Coal Corp.,* 233 Ky. 588, 26 S.W.2d 481, 483 (1930) (emphasis added). We most recently reiterated this rule in *Jarvis v. Nat'l City Bank,* 410 S.W.3d 148, 153 (Ky.2013), and it has been consistently expressed throughout the years. *See Foley v. Commonwealth,* 306 S.W.3d 28, 31 (Ky.2010); *Applegate v. Commonwealth,* 299 S.W.3d 266, 271 (Ky.2009); *Nordike v. Nordike,* 231 S.W.3d 733, 739 (Ky.2007); and *Veith v. City of Louisville,* 355 S.W.2d 295, 297 (Ky.1962).

*McConnell* cites to *Lowery v. County of Jefferson,* 458 S.W.2d 168 (Ky.1970), as authority for the proposition that an issue will be deemed to be justiciable, even in the absence of adversarial interests, when the issue "has immediacy" and "a useful public purpose" is served by an adjudicated resolution. *Lowery,* however, does not say that. *Lowery,* which involved the validity of a county tax, does not dispense with the requirement of adversarial parties. To the contrary, the opinion clearly notes that a justiciable controversy was presented because Lowery, a representative citizen and taxpayer, although not "a bitter antagonist to the county," had nonetheless "argued the issues honestly and competently, the issues are genuine and have immediacy, are appropriate for decision, and a useful public purpose will be served by deciding them." *Id.* at 176.

The urgency for a judicial resolution of an issue and the utility of an adjudicated resolution are not wise and equivalent substitutes for adversarial parties advocating the pros and cons of a matter of public importance. Generations of common law and constitutional experience have taught us that the tension between the adversaries brings forth the most cogent grounds upon which matters of significant public importance should be decided. The adversarial system promotes sound judicial reasoning by assuring that the courts are fully and fairly informed. Rather than a reason for dismissing the requirement for adversarial parties, the heightened immediacy and public importance of an issue are all the more reason to require true adversarial participation.

We conclude, therefore, that *McConnell* is neither well-reasoned nor well-supported. It is an outlier and an

unwise deviation from an otherwise sound and well-settled principle. Accordingly, we overrule it. Neither the great public interest in an important issue nor the urgency in having it judicially resolved will suffice to establish the justiciability of an action for a declaration of rights under KRS 418.020 or KRS 418.040. For a cause to be justiciable, there must be a present and actual controversy presented in good faith by parties with adverse interests in the subject to be adjudicated.

We do not suggest that the adversaries must be inhospitable or hostile. The agreed case aspect of KRS 418.020 simply means that the adverse and antagonistic sides of an issue may agree upon a civil presentation of the case to the court for an adjudicated resolution. The statute allows "[p]arties to a question which might be the subject of a civil action"[7] to mutually present their disagreement to the court. The statute incorporates the constitutional requirement for justiciability by requiring proof by affidavit that the "controversy is real" and "the proceedings [are brought] in good faith."

By any definition, a controversy is a disagreement[8] and a disagreement requires parties that disagree. A case brought under KRS 418.020 is an agreed case only in the sense that parties engaged in a real controversy can mutually agree to ward off a potential civil action by asking the court to "render judgment as if an action were pending." KRS 418.020 allows parties in good faith disagreement with one another to seek a judicial resolution of their controversy. It does not allow parties with no controversy between them to seek a judicial affirmation of their mutually-held position.

We conclude that the trial court erred when it concluded, prior to the intervention of the Foundation, that the Petition presented a justiciable controversy. However, we agree with the Court of Appeals that the intervention of the Foundation cured the constitutional infirmity attendant to this matter when it lacked parties with adverse interests at stake. Thus, the full participation by the Foundation before the appellate courts presented a justiciable controversy.

## III. THE HORSE RACING COMMISSION HAS THE AUTHORITY TO LICENSE AND REGULATE PARI-MUTUEL WAGERING ON HISTORICAL HORSE RACING

■ The Foundation challenged the regulatory changes adopted by the Commission for the licensure of wagering on historical horse races on the grounds that the Commission exceeded the scope of authority granted to it by KRS Chapter 230, and principally KRS 230.215. Specifically, the Foundation argues that the statutes limit the Commission's authority to licensing and regulating only "pari-mutuel wagering" on "legitimate horse racing." In the Foundation's view, a pre-recorded video display of a horse race is not "legitimate horse racing" and wagering on an Instant Racing terminal does not qualify as "pari-mutuel wagering."

---

**7.** The specific reference to "a civil action" suggests that the process authorized by KRS 418.020 may not be available to resolve in advance of prosecution the viability of a criminal action, such as the question of whether wagering on historical horse racing devices pursuant to the new regulations would violate the gambling prohibitions of Chapter 528 of the Kentucky Penal Code. That question appears not to have been raised in this action.

**8.** *The New Oxford American Dictionary* 379 (3rd ed.2010) defines "controversy" as "disagreement, typically when prolonged, public and heated."

One of the fundamental tenets of administrative agency law is that an administrative agency "is limited to a direct implementation of the functions assigned to the agency by the statute. Regulations are valid only as subordinate rules when found to be within the framework of the policy defined by the legislation." *Flying J Travel Plaza v. Com., Transp. Cabinet, Dep't of Highways*, 928 S.W.2d 344, 347 (Ky.1996). "[R]egulations may not exceed the scope of the statutory provisions on which they are based." *Faust v. Commonwealth*, 142 S.W.3d 89, 98 (Ky.2004). An administrative agency may not by regulation "amend, alter, enlarge, or limit terms of legislative enactment." *Bd. of Educ. of Fayette County v. Hurley–Richards*, 396 S.W.3d 879, 889 n. 12 (Ky.2013) (quoting *Ruby Const. Co. v. Dep't of Revenue, Com. ex rel. Carpenter*, 578 S.W.2d 248, 252 (Ky.App.1978)).

The Foundation first argues that the failure of the 2010 legislative effort to confer explicit legislative approval of historical horse wagering signals that the General Assembly does not share the intent to promote historical racing in Kentucky, and supports its argument that the current statutes were not intended to authorize historical racing. When the legislature enacts new statutes, or amends an old one, it is usually possible, though sometimes difficult, to discern a legislative intent from the words of the statute itself. However, the legislature's failure or its refusal to enact proposed legislation says nothing to indicate a collective legislative intent. There are myriad reasons that individual legislators may decline to support proposed legislation, and the failure of a bill to receive the support of a majority of the legislature says nothing about that body's collective intent as to existing statutes that remain unchanged. We can do no more than speculate as to the legislature's collective intent, if it even had a collective intent, in failing to pass a bill. The silence of the legislature might mean that a majority of its members rejected the proposed amendments because they believed the current statutes were broad enough without further clarification to accommodate these new forms of wagering; or it may mean that they opposed the extension of horse race wagering by such methods. We discern the meaning of the law from the words used by the General Assembly in the laws it enacted, not from the words of legislation it rejected.

We reject the Foundation's argument that historical horse racing falls outside the statutorily-circumscribed parameter of "legitimate horse racing." Although "legitimate horse racing" is not expressly defined in KRS Chapter 230, we find nothing in the statutes to suggest that a "legitimate" horse race must be a "live" horse race, and we find nothing in Chapter 230 indicating that an otherwise legitimate horse race loses its legitimacy when later viewed by way of a video recording. Rather, it is apparent from a reading of KRS Chapter 230 in its entirety, and noting each separate section in context with the whole, that "legitimate" horse racing is horse racing that is:

conducted in the Commonwealth so as to encourage the improvement of the breeds of horses in the Commonwealth, to regulate and maintain horse racing at horse race meetings in the Commonwealth of the highest quality and free of any corrupt, incompetent, dishonest, or unprincipled horse racing practices, and to regulate and maintain horse racing at race meetings in the Commonwealth so as to dissipate any cloud of association with the undesirable and maintain the appearance as well as the fact of complete honesty and integrity of horse racing in the Commonwealth.

KRS 230.215.

The legislative concern for the "legitimacy" of the race is focused on the integrity

of the racing event itself and of the individuals involved in it and the appearance of propriety they project. The medium through which a horse race is viewed, or recorded for future viewing, has no effect on a race's "legitimacy."

There is no doubt that it was the intention of the General Assembly to vest the Commission with "forceful control of horse racing in the Commonwealth" and the wagering thereon. KRS 230.215(2). We cannot say that, conceptually, watching a video-taped (or digitally-recorded) image of a horse race makes the event any less of a horse race than watching a re-run of a basketball game makes it something other than a basketball game. Nevertheless, as explained below, the dearth of evidentiary material in the record considered by the trial court precludes us from determining whether the specific form of historical horse racing contemplated by the Associations complies with all of the regulatory standards for legitimate racing, but we do say that the fact that the races are recordings of races run at a different time and place does not place them outside the boundaries of "legitimate racing," and thus beyond the authority of the Kentucky Horse Racing Commission.

■ The Foundation also attacks the propriety of the regulations by arguing that they authorize wagering in a form that is not truly pari-mutuel. KRS Chapter 230 requires all authorized horse race wagering in Kentucky to be based upon a pari-mutuel system of wagering. The Chapter, however, does not provide a definition of pari-mutuel wagering. Section 3002(13) of the federal Interstate Horse Racing Act, 15 U.S.C. § 3001, *et seq.*, defines pari-mutuel wagering as "any system whereby wagers with respect to the outcome of a horserace are placed with, or in,

a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator." That definition comports well with the system of wagering described by our predecessor court, in *Commonwealth v. Kentucky Jockey Club*, 238 Ky. 739, 38 S.W.2d 987, 991 (1931), as "French pool," or "Paris mutual" wagering:

> In French pool the operator of the machine does not bet at all. He merely conducts a game, which is played by the use of a certain machine, the effect of which is that all who buy pools on a given race bet as among themselves; the wagers of all constituting a pool going to the winner or winners. The operator receives 5 per cent of the wages as his commission. But in selling ordinary pools on horse races the seller does not operate a 'machine or contrivance used in betting.' Neither does he bet on a horse race.

Without a more particular definition provided by statute, we conclude that Chapter 230's references to pari-mutuel wagering were intended to incorporate the conception of the pari-mutuel wagering described in the federal statutes and the substantially similar common law expression provided by the courts of the Commonwealth, as evidenced in *Kentucky Jockey Club*.

The Commission has provided a regulatory definition of pari-mutuel wagering, describing it as "a system or method of wagering approved by the commission in which patrons are wagering among themselves and not against the association and amounts wagered are placed in one or more designated wagering pools and the net pool is returned to the winning pa-

trons."[9] We conclude upon review that this definition is consistent with the references to pari-mutuel wagering in KRS Chapter 230.

Pursuant to KRS 230.215, the Commission is authorized to license operations for wagering on horse racing *only* if the wagering is pari-mutuel in form. The regulations promulgated by the Commission allow for licensing horse race wagering *only* for operations that are pari-mutuel in form. The Commission, therefore, purports to license nothing beyond what the enabling statutes of Chapter 230 authorize and direct it to do.

Because the regulations promulgated by the Commission for the licensing of historical horse race wagering are consistent with the statutory mandate for "pari-mutuel wagering" on "legitimate horse racing," we conclude that the Commission did not exceed the scope of its authority, and the regulations are therefore not invalid. Accordingly, we affirm the judgment of the trial court insofar as it concluded that the regulations adopted by the Commission to license the operation of pari-mutuel wagering on historical horse racing was a valid and lawful exercise of the Commission's statutory authority under KRS Chapter 230.

## IV. DEPARTMENT OF REVENUE EXCEEDED ITS AUTHORITY WHEN IT AMENDED ITS REGULATIONS SO AS TO COLLECT A TAX UPON HISTORICAL HORSE RACE WAGERING

After the Commission adopted regulations for licensing the operation of devices for wagering on historical horse racing, the Department responded with an amended regulation[10] subjecting such wagering to the pari-mutuel excise tax provided for in KRS 138.510(1). The Department then joined the other Appellants in petitioning the Franklin Circuit Court for a declaration of rights to determine, among other things, the legality of the newly-extended tax. The Foundation challenged the Department's authority to impose such a tax.

Our review of the matter follows well-settled and broadly recognized principles concerning taxation powers and the relationship between enabling statutes and their derivative regulations. First, only the legislature has the authority to impose a tax. *Hager v. Walker*, 128 Ky. 1, 107 S.W. 254, 260 (1908), expressed this well-established principle as follows:

> [I]t is everywhere conceded that the power to lay taxes is the highest attribute of sovereignty, the exercise of which is confided alone to the lawmaking department of the government[.] The amount of tax that shall be thus imposed, if uniform and not restrained by constitutional provisions, is vested exclusively in the legislative department of the state, and entirely beyond the power of the courts to control.

See also *Long Run Baptist Ass'n. v. Louisville & Jefferson County Metro. Sewer Dist.*, 775 S.W.2d 520, 522 (Ky.App. 1989) ("[T]axation is a legislative function which if delegated to [a municipal agency] would violate Sections 27 and 28 of the Kentucky Constitution."). The role of the Department, as an agency within the executive branch of government, is to collect the tax imposed by the legislature. It is, therefore, fundamental that the Department cannot within the bounds of constitutional limits *establish* a tax by its own accord.

9. See 810 KAR 1:001(48); 811 KAR 1:005(54); and 811 KAR 2:010(68).

10. 103 KAR 3:050.

Second, regulations adopted by an administrative agency, such as the Department of Revenue, "may not exceed the scope of the statutory provisions on which they are based." *Faust v. Commonwealth, Tourism Dev. Cabinet, Dept. of Parks,* 142 S.W.3d 89, 98–99 (Ky.2004). "Regulations are valid only as subordinate rules when found to be within the framework of the policy defined by the legislation. It is our responsibility to ascertain the intention of the legislature from the words used in enacting the statute rather than surmising what may have been intended but was not expressed." *Flying J Travel Plaza v. Commonwealth, Transp. Cabinet, Dept. of Highways,* 928 S.W.2d 344, 347 (Ky.1996). An administrative agency "cannot by its rules and regulations, amend, alter, enlarge or limit the terms of [a] legislative enactment." *Camera Ctr., Inc. v. Revenue Cabinet,* 34 S.W.3d 39, 41 (Ky.2000).

The Department sets out KRS 138.510(1) and KRS 138.511(3) as the enabling statutory authority for extending the excise tax to the wagering on historical horse racing described in this opinion. As relevant here, KRS 138.510(1) states: "an excise tax is imposed on all tracks conducting pari-mutuel wagering on *live racing* under the jurisdiction of the [Kentucky Horse Racing] commission." (emphasis added). The amount of the excise tax is expressly stated in the statutes as a percentage of "all the money wagered on *live races* at the track during the fiscal year." KRS 138.510(1)(a)(1) (emphasis added). The percentage varies depending on the amount of the track's "daily average *live* handle," and other factors, (emphasis added). KRS 138.510(1)(a)(2).

"Daily average live handle" is defined at KRS 138.511(3) as "the total wagered at a track on live racing," with certain exceptions stated below. "Live racing" and "live races" are terms not defined by the statutes, and thus we accord to them their common, everyday meaning. *Commonwealth v. McBride,* 281 S.W.3d 799, 806 (Ky.2009) ("Every term in a statute need not be defined, and terms that are not defined are to be accorded their common, everyday meaning.").[11]

In opposition to the extension of the excise tax, the Foundation contends that, because the enabling statutes expressly limit the state's taxing authority to moneys wagered on "live racing" and "live races," the Department has exceeded its lawful authority by attempting to collect an excise tax on the wagering on video recordings of previously-run races. The Department concedes that no statute expressly subjects wagering on historical races to the excise tax. Nevertheless, the Department argues that its power to collect an excise tax on historical race wagering must be inferred from the statutory context.

The Department reasons that if the meaning of "daily average live handle" is limited to races physically held at the track where the wagering is being conducted, we render meaningless subsections (a) through (e) of KRS 138.511(3). Those subsections exclude from the meaning "daily average live handle" the following sources of money being wagered on racing: (a) money wagered at a receiving track;[12]

---

11. KRS 446.080(4) requires: "All words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning." The phrases "live racing" and "live races," as used in the statutes relied upon by the Department, are not technical and have not acquired a peculiar and appropriate meaning in the law.

12. A "receiving track" refers to a race track that "receives" a simulcast broadcast from a "sending track."

(b) money wagered at a simulcast facility; (c) money wagered on telephone account wagering; (d) money wagered through advance deposit account wagering; and (e) money wagered at a track participating as a receiving track or simulcast facility displaying simulcasts and conducting interstate wagering as permitted by KRS 230.3771 and 230.3773. Notably, and contrary to the Department's point, all of the identified exclusions involve money wagered on live horse races running contemporaneously with the wagering upon them, or transmitted upon such a brief delay as to be the practical equivalent of contemporaneous.[13] None involve races that were finished long before the wagering on their outcomes such as we address was even contemplated. Accordingly, wagering on historical horse races is easily distinguished from subsections (a) through (e) of KRS 138.511(3).

The Department further asserts, in effect, that the meaning of "live racing" is relative to the observer's perception of it, and so the definition of this term will vary depending upon the viewer. Thus, it posits that "[f]rom the perspective of a wagerer, a historic horse race is very much 'live.'" The trial court said it was "not wholly convinced" by that argument, but was nevertheless persuaded that racing is, indeed, "live" if the wagerer "does not know the outcome of the race in advance."[14] However, this conception of the word "live" leads to the absurd phenomenon that if some viewers do, per chance, know the outcome in advance, while other viewers do not, the race would be both "live" and "not live" at the same time among this group of viewers. In light of this interpretation's absurdity and its departure from ordinary and everyday language, we reject the Department's argument and the trial court's conclusion that a historical race such as we address is a "live race" in the sense intended by the legislature in choosing that terminology.

■ First and foremost, the English language is the medium by which our society exchanges thoughts and ideas. Our respect for the language and the need to preserve its value as a medium of exchange rightfully limits the extent to which we will wander from the plain and obvious meaning of everyday words, such as the adjective "live."

At least since the advent of motion pictures and television, no competent person reasonably versed in the English language can fail to comprehend the meaning of the term "live" in the context we now consider. We are all familiar with its common use in phrases such as "live testimony," "live performances," "live broadcasts," and "live music." The ordinary speaker of English will not confuse those concepts with "recordings of live testimony," "recordings of live performances," and so on.

The legislature has imposed a tax upon wagering at live racing. KRS 138.510(3). The same law bases the amount of the tax upon the money "wagered on live races at the track." We simply cannot bend and stretch the English language far enough to refer to a machine that displays video recordings of thoroughbred horse races that occurred in the distant past as live racing.

13. For example, "Simulcasting" means "the telecast of live audio and visual signals of horse races for the purpose of pari-mutuel wagering." See KRS 230.210.

14. Such reasoning obviously ignores the fact that if the wagerer knew the outcome in advance of the race, it would not even be a wager. *Random House Webster's College Dictionary* 1946 (1st ed.1995) defines "wager" as "something risked or staked on an uncertain event."

Nothing in the statutes indicates that the legislature intended for us to do so.

■■■■ In addition to our obligation to respect the common meaning of ordinary words, we have consistently held firm to the rule that statutes imposing taxes are to be strictly construed *against* the imposition of the tax, because when the legislature means to impose a tax, it has the means to do so explicitly. As a general rule:

Taxing laws should be plain and precise, for they impose a burden upon the people. That imposition should be explicitly and distinctly revealed. If the Legislature fails so to express its intention and meaning, it is the function of the judiciary to construe the statute strictly and resolve doubts and ambiguities in favor of the taxpayer and against the taxing powers.

*George v. Scent,* 346 S.W.2d 784, 789 (Ky. 1961) (citation omitted.). "This is particularly so in the matter of pointing out the subjects to be taxed." *Id.*

■■■■ "As we have stated before, the ordinance is a revenue law and Kentucky requires that all such laws must be strictly construed with doubts concerning irregularity of the ordinance resolved in favor of the taxpayer." *City of Erlanger v. KSL Realty Corp.,* 819 S.W.2d 707, 709 (Ky. 1991). Thus, the Department would have us swim, not only against the current of a term's common meanings, but also against the tide of our own settled rules for the construction of tax statutes. We decline to do so. It is a simple enough matter that, if the legislature intended to tax wagering on historical horse racing, it would not do so by means of a statute that limited the Department's taxing authority in this con-

text to monies wagered on live racing and live races.

We therefore conclude that that the Department exceeded its statutory authority when it amended 103 KAR 3:050 to provide for the collection of a tax on the money wagered on historical horse racing devices. Accordingly, we reverse the judgment of the Franklin Circuit Court insofar as it concluded otherwise.

## V. FURTHER PROCEEDINGS IN THE TRIAL COURT ARE REQUIRED TO DETERMINE WHETHER THE LICENSED OPERATION OF WAGERING ON HISTORICAL RACING RUNS AFOUL OF THE GAMBLING PROVISIONS OF THE KENTUCKY PENAL CODE

■■ Appellants argue that the Court of Appeals erred when it concluded that the Foundation had the right to "present [in the trial court] evidence to establish that the wagers made by patrons at electronic gaming machines do or do not meet the definition of pari-mutuel wagering on a horse race." We disagree with Appellants.

The very question posed to the trial court by the Petition is whether "the licensed *operation* of pari-mutuel wagering on historical horse races, as authorized by the Regulations, . . . contravene[s] the statutory prohibitions on gambling contained in [KRS] Chapter 528, because it is an authorized form of pari-mutuel wagering exempted pursuant to KRS 436.480." (emphasis added).[15] From the Associations' perspective, the purpose of asking that question was to obtain *before* actually conducting operations for wagering on historical horse racing a ruling of the court on the issue in order to "eliminate or minimize the risk of wrong action" and "to

---

15. KRS 436.480 states, "KRS Chapter 528 shall not apply to pari-mutuel wagering au-

thorized under the provisions of KRS Chapter 230."

ensure that they may proceed without being subject to any legal penalties, including criminal liability under Kentucky's penal code."

KRS 436.480 insulates the licensed operation of horse race wagering from criminal prosecution only if it conforms to the requirements for pari-mutuel wagering. We can say, as we have in the preceding sections of this opinion, that as a matter of law the regulations allowing for pari-mutuel wagering on historical horse racing are valid. But, as the Court of Appeals understood, whether the "operation" of historical horse race wagering in the form of the pay-outs at the specific terminals under review, pursuant to a license issued by the Commission actually "*is*" an authorized form of pari-mutuel wagering is a question of fact that cannot fairly be answered in the abstract. To answer the question posed by Appellants in a way that "eliminates or minimizes" the risk of prosecution, one must examine the methodology of the wagering they would undertake to determine if it is actually pari-mutuel in form.

We agree with the Court of Appeals that the Foundation, as an intervening Respondent in the trial court action, had the right pursuant to CR 26.02 to engage in discovery to develop the evidence required to determine if the operation of historical horse race wagering as contemplated by Appellants conforms to the requirements of KRS Chapter 230 and KRS 436.480 for pari-mutuel wagering, so as to exempt such wagering from the prohibitions of KRS Chapter 528. We therefore affirm the Court of Appeals, insofar as it reversed this aspect of the trial court's judgment.

## VI. CONCLUSION

For the reasons stated above: We (1) reverse the Court of Appeals insofar as it vacated the judgment of the Franklin Circuit Court in all respects; (2) affirm the Franklin Circuit Court's judgment holding that the regulations of the Kentucky Horse Racing Commission for licensing of pari-mutuel wagering on historical horse racing are a valid and lawful exercise of the Commission's authority; (3) affirm the opinion of the Court of Appeals insofar as it remanded this matter to the Franklin Circuit Court for discovery pursuant to CR 26, and further proceedings relevant to the issue whether the licensed operation of wagering on historical horse racing as contemplated by Appellants constitutes a pari-mutuel form of wagering; and (4) reverse the Franklin Circuit Court's judgment relating to the authority of the Kentucky Department of Revenue for taxing the wagering on historical horse races; instead, we adjudge that the Department lacks the statutory authority to tax the money wagered on historical horse racing devices.

All sitting. All concur.