RENDERED: DECEMBER 22, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0003-MR

MATTHEW WORKMAN                                           APPELLANT

APPEAL FROM SIMPSON CIRCUIT COURT
v.        HONORABLE JOHN DAVID SIMCOE, SPECIAL JUDGE
ACTION NO. 21-CI-00029

KENTUCKY DOWNS, LLC AND
KYD, LLC                                                 APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; JONES AND L. THOMPSON,
JUDGES.

CLAYTON, CHIEF JUDGE: Matthew Workman ("Workman") appeals from the

Simpson Circuit Court's order granting Appellees' motion to dismiss Workman's

action under Kentucky's Loss Recovery Act (the "Act"). Workman sought to

recover certain losses from wagers placed on historical horse racing under the Act.

Because the Appellees' actions fall under the safe-harbor provisions of the Act contained in Kentucky Revised Statute ("KRS") 372.005, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case centers around wagers on historical horse racing at a facility known as Kentucky Downs. The legal landscape of wagering on historical horse racing in Kentucky has a multifaceted history. As the Kentucky Supreme Court has discussed, "[f]aced with serious financial challenges and seeking a means to develop new revenue sources, Kentucky's horse racing industry expressed interest in developing the use of devices for wagering on historical horse races." *Appalachian Racing, LLC v. Family Trust Foundation of Kentucky, Inc.*, 423 S.W.3d 726, 730 (Ky. 2014). As the Court went on to explain, "[h]istorical horse races are horse races that have been run sometime in the past at an approved racing facility and are then currently presented in the form of a video display on an electronic device, or terminal, at which individual wagerers may place bets." *Id.* (footnote omitted).

Thus, in July 2010, the Kentucky Horse Racing Commission (the "Commission") revised the applicable administrative horse racing regulations and promulgated new regulations with an eye toward accommodating the racing industry's appeal for wagering on historical horse races. *Id.* at 731 (footnote omitted). The Commission did so pursuant to KRS 230.215(1), which states that

the Commission has the authority to "grant[] or den[y]" the "privilege" of "participat[ing] in any way in horse racing, or the entrance to or presence where horse racing is conducted[.]" To that end, the General Assembly vested the Commission with "forceful control of horse racing in the Commonwealth" and "plenary power to promulgate administrative regulations prescribing conditions under which all legitimate horse racing and wagering thereon is conducted in the Commonwealth[.]" KRS 230.215(2).

Specifically, the Commission added specific language to the administrative regulation permitting historical horse racing:

> [w]agering on an historical horse race is hereby authorized and may be conducted in accordance with KRS Chapter 230 and 810 [Kentucky Administrative Regulation ("KAR")] Chapter 1.

810 KAR 1:011 Section 3(1).

The Commission also revised and promulgated other regulations authorizing wagering on historical horse racing. Of note is 810 KAR 1:001 Section 1(48),[1] which defined "pari-mutuel wagering" as a "system or method of wagering approved by the [C]ommission in which patrons are wagering among themselves and not against the association and amounts wagered are placed in one or more designated wagering pools and the net pool is returned to the winning

---

[1] This language has been revised, and the current version can be found in KRS 230.210(15) and 810 KAR 6:001 Section 1(53).

-3-

patrons." Additionally, 810 KAR 1:120 Section 4(1) provided that "[a]n association shall submit a written request to the [C]ommission for permission to offer any exotic wager on an historical horse race" and set forth the requirements for the request and approval process.

Following the Commission's promulgation of the regulations, the Commission and several racing facilities in Kentucky, including Kentucky Downs, filed a Joint Petition for Declaration of Rights in the Franklin Circuit Court (the "Franklin Court"), asking for a declaratory judgment affirming the validity of the regulations. *Appalachian Racing*, 423 S.W.3d at 731. The Franklin Court permitted The Family Trust Foundation of Kentucky, Inc. (the "Foundation"), a Kentucky non-profit corporation, to intervene in the action. *Id*. at 730.

Thereafter, the Franklin Court issued an opinion and order in December 2010, determining that the Commission's regulations for licensing of pari-mutuel wagering on historical horse racing were a valid and lawful exercise of the Commission's authority. Following the Frankfort Court's opinion, in September 2011, Kentucky Downs began offering historical horse race wagering using a system approved by the Commission.

The *Appalachian Racing* case ultimately reached the Kentucky Supreme Court, which determined in February 2014 that "[b]ecause the regulations promulgated by the Commission for the licensing of historical horse race wagering

are consistent with the statutory mandate for 'pari-mutuel wagering' on 'legitimate horse racing,'" the regulations were not invalid. *Id*. at 738. The Supreme Court further held that the regulatory definition of "pari-mutuel wagering" was consistent with the references to pari-mutuel wagering in KRS Chapter 230. *Id*. at 737-38.

In upholding the Commission's regulations, the Court recognized that the Commission's and racing facilities' purpose:

> was to obtain *before* actually conducting operations for wagering on historical horse racing a ruling of the court on the issue in order to eliminate or minimize the risk of wrong action and to ensure that they may proceed without being subject to any legal penalties, including criminal liability under Kentucky's penal code.

*Id*. at 741-42 (emphasis in original) (internal quotation marks omitted).

However, the Supreme Court did remand the case to the Franklin Court for "further proceedings relevant to the issue [of] whether the licensed operation of wagering on historical horse racing as contemplated by Appellants constitute[d] a pari-mutuel form of wagering[.]" *Id*. at 742. This Court denied the Foundation's requests for an injunction or stay during the appeals process.

After several years of discovery, the Franklin Court held a bench trial in January 2018. In October 2018, the Franklin Court issued an opinion "that the Encore system [of historical horse race wagering] constituted a pari-mutuel system of wagering, approved by the Commission and meeting the elements of 810 KAR 1:001 § 1(48)." *Family Trust Foundation of Kentucky, Inc. v. Kentucky Horse*

*Racing Commission*, 620 S.W.3d 595, 599 (Ky. 2020), *reh'g denied* (Jan. 21, 2021).

After accepting a transfer, the Supreme Court disagreed with the Franklin Court, determining in September 2020 that the Franklin Court "erred in its conclusion that pari-mutuel wagering does not require patrons to wager on the same horse races, nor does it require reciprocity among patrons." *Id.* at 601 (internal quotation marks and brackets omitted). The Supreme Court remanded the case to the Franklin Court for entry of a judgment consistent with its opinion. *Id.* at 603.

Meanwhile, the General Assembly passed Senate Bill 120 in its 2021 session, which codified the definition of "pari-mutuel wagering" to include wagering on historical horse races. The Governor signed Senate Bill 120 on February 22, 2021, after which it became immediately effective as KRS 230.210. Additionally, following the passage of Senate Bill 120, the Commission adopted new regulations in accordance with the new definition of pari-mutuel wagering.

In the meantime, the Franklin Court entered judgment in compliance with the Supreme Court's opinion in March 2021, holding that the subject wagering system was "not a form of pari-mutuel wagering under the laws in effect at the time of the Kentucky Supreme Court's September 24, 2020, Opinion." However, the Franklin Court did not give the decision retroactive application, as it

found that the racing associations had not operated the wagering systems in violation of a court order. The Foundation moved to alter or amend and give the judgment retroactive application, which the Franklin Court denied.

On January 24, 2021, Workman filed the complaint underlying this appeal in Simpson County against Kentucky Downs. Workman sought to recover under the Act, or KRS 372.040. The Simpson Circuit Court (the "Simpson Court") entered a final order in this case on November 23, 2021. In its ruling, the Simpson Court determined that the racing association had operated the gaming systems based upon their reliance on the Commission's apparent authority, permission, and authorization. It further noted that, while the Kentucky Supreme Court found the Commission's authorization invalid, "[a] party has the right to rely on approvals of commissions and previous court opinions unless and until they are overturned, or injunctive relief is granted." Thus, the Simpson Court granted the Appellees' motion to dismiss. This appeal followed.

We will discuss further facts as they become relevant.

## ANALYSIS

As previously discussed, Workman's claims rely on the Loss Recovery Act contained in KRS Chapter 372. KRS 372.020 affords a losing gambler with a first-party cause of action to recover any losses he or she incurs. If a losing gambler fails to bring a recovery action under KRS 372.020 within a

-7-

certain amount of time, KRS 372.040 permits "any other person" a third-party

cause of action against the winning gambler and allows for the recovery of treble

damages. Specifically, KRS 372.040 states:

> [i]f the loser or his creditor does not, within six (6)
> months after its payment or delivery to the winner, sue
> for the money or thing lost, and prosecute the suit to
> recovery with due diligence, any other person may sue
> the winner, and recover treble the value of the money or
> thing lost, if suit is brought within five (5) years from the
> delivery or payment.

However, KRS 372.005 contains a safe-harbor provision, which

provides that "[t]he terms and provisions of this chapter do not apply to betting,

gaming, or wagering **that has been authorized, permitted, or legalized**,

including, but not limited to, all activities and transactions permitted under KRS

Chapters 154A, 230, and 238." (Emphasis added.)

In this case, Workman alleges he is entitled to maintain his third-party

action under KRS 372.040 for the un-filed wager losses on historical horse racing

at Kentucky Downs, or $200,243,797.00. Alternatively, the Appellees argue that

KRS 372.005's exception applies in this case, as all wagers were "authorized," or

"permitted" by the Commission and previous court rulings.

In beginning our analysis of the safe-harbor language contained in

KRS 372.005, we note that "[i]t is an elementary rule of construction that effect

must be given, if possible, to every word . . . of a statute." *Hampton v.*

*Commonwealth*, 257 Ky. 626, 630, 78 S.W.2d 748, 750 (1934) (citations omitted). Moreover, "a statute should be construed, if possible, so that no part of its provisions are rendered meaningless." *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth Transp. Cabinet*, 983 S.W.2d 488, 492 (Ky. 1998) (citation omitted). Further, a statute's words should be given their "normal, ordinary, everyday meaning[,]" and an unambiguous statute should be applied as written. *Stephenson v. Woodward*, 182 S.W.3d 162, 169-70 (Ky. 2005).

In his appeal, Workman concentrates primarily on the legality of historical horse racing when discussing the exception under KRS 372.005. Stated differently, Workman's action was based on the idea that, because the Supreme Court ultimately determined that historical horse racing systems did not qualify as pari-mutuel wagering, the operation of historical horse racing systems was illegal at all points in time. However, KRS 372.005's safe-harbor provision not only protects betting, gaming, or wagering that is "lawful," but also protects betting, gaming, or wagering that is "authorized" *or* "permitted."

Indeed, *Black's Law Dictionary* broadly defines "authorize" in two ways: "[t]o give legal authority; to empower," and "[t]o formally approve, to sanction." Likewise, "permit" has three definitions: "[t]o consent to formally; to allow (something) to happen, esp. by an official ruling, decision, or law"; "[t]o give opportunity for; to make (something) happen"; or "[t]o allow or admit of."

BLACK'S LAW DICTIONARY (11th ed. 2019). Under their "normal, ordinary, everyday meaning," the Commission "authorized" and "permitted" historical horse racing at Kentucky Downs at all times that Kentucky Downs offered historical horse racing.

Specifically, in July 2011, the Commission approved KYD's request to offer historical horse racing using the Instant Racing System, which Kentucky Downs used from September 2011 to March 2015. In March 2015, the Commission approved KYD's request to use the Exacta System, which Kentucky Downs used from April 2015 to March 2019. In August 2020, the Commission approved Kentucky Downs' request to use the Ainsworth System. Thus, under the definition of "authorize" discussed above, the Commission "formally approve[d]" or "sanction[ed]" Kentucky Downs' use of wagering systems for historical horse racing. Further, under the definition of "permit," the Commission "allow[ed]" the wagering at issue by an "official ruling [or] decision."

Moreover, multiple levels of Kentucky courts have authorized and permitted Kentucky Downs' operation of historical horse racing wagering. The Franklin Court initially allowed historical horse racing and licensed operation of terminals allowing for pari-mutuel wagering in 2010. While the Foundation appealed, it did not post a bond and was not granted injunctive relief during the extensive appeals process.

In 2014, while the Supreme Court remanded the matter to the Franklin Court for further fact-finding, the Supreme Court held that the regulations and definition of "pari-mutuel" were valid and "consistent with the statutory mandate for 'pari-mutuel wagering' on 'legitimate horse racing[.]'" *Appalachian Racing*, 423 S.W.3d at 738. Again, the courts granted no injunctions.

Additionally, the Supreme Court's September 2020 opinion did not hold that the regulations were invalid or that Kentucky did not permit historical horse racing, and it did not instruct the racing associations to cease operations. Thus, we find that the Appellees fall within the Act's safe-harbor provisions.

Because we have already determined that the Appellees fall under the safe-harbor provision of the Act contained in KRS 372.005, we decline to address Workman's "apparent authority" argument. Additionally, because the Simpson Court did not discuss the issue of whether Workman had standing in this matter, we decline to address Workman's arguments concerning such issue.

## CONCLUSION

For the foregoing reasons, we affirm the Simpson Circuit Court.


ALL CONCUR.

BRIEFS FOR APPELLANT:

Andre F. Regard
Lexington, Kentucky


ORAL ARGUMENT FOR
APPELLANTS:

Andre F. Regard
Lexington, Kentucky

BRIEF FOR APPELLEES:

Jay E. Ingle
Christopher F. Hoskins
Lexington, Kentucky


Timothy J. Crocker
Franklin, Kentucky


ORAL ARGUMENT FOR
APPELLEES:

Jay E. Ingle
Christopher F. Hoskins
Lexington, Kentucky

*AMICUS CURIAE* BRIEF FOR
CHURCHILL DOWNS
INCORPORATED:

Philip W. Collier
Chadwick A. McTighe
Jeffrey S. Moad
Bethany A. Breetz
Louisville, Kentucky