Argued and submitted March 25, affirmed December 30, 2009, petition for
review denied April 29, 2010 (348 Or 280)

## MEC OREGON RACING, INC.,
dba Portland Meadows,
*Petitioner,*

*v.*

## OREGON RACING COMMISSION,
*Respondent.*

Oregon Racing Commission
700263; A138804

225 P3d 61

Stephen S. Walters argued the cause for petitioner. With him on the briefs was Allen Matkins Leck Gamble Mallory & Natsis LLP.

Denise G. Fjordbeck, Attorney-in-Charge, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

## LANDAU, P. J.

■    Petitioner MEC Oregon Racing, Inc., dba Portland Meadows, petitions for review of an order of the Oregon Racing Commission denying its request to add a form of wagering on historical—as opposed to live—horse races known as "Thoroughbred Mania" to its previously approved race meet license.[1] The commission's order denied MEC Oregon's request on a number of different grounds, including that Thoroughbred Mania is not a form of "mutuel" wagering that is permitted by law and that, in any event, the commission's authority to approve mutuel wagering on horse races is limited to live races. The commission further concluded that Thoroughbred Mania wagering machines are prohibited "slot" machines or "gray" machines. On review, MEC Oregon contends that each of the bases for the commission's denial of its request is erroneous as a matter of law. We conclude that the commission correctly determined that, even if Thoroughbred Mania is a form of mutuel wagering, the commission's authority to approve such wagering on horse races is limited to live races. We therefore affirm on that basis and do not address MEC Oregon's other contentions.

We begin with a description of the regulatory context for MEC Oregon's request and the commission's decision. All race meets held in Oregon are subject to licensing and regulation by the Oregon Racing Commission. ORS 462.010 - 462.740. A "race meet" is any exhibition of animal racing where the "mutuel" system of wagering is used in conjunction with any race. ORS 462.010(2). "Mutuel" wagering is defined as "a system whereby wagers with respect to the outcome of a

---

[1] The license on review is for the period October 1, 2007 through September 20, 2008. Petitioner has also filed requests with the commission with respect to its licenses for 2008-09 and 2009-10, to amend its annual race meet license to allow Thoroughbred Mania. The commission has held those requests in abeyance pending the outcome of this judicial review. For that reason, we conclude that petitioner continues to be affected by the commission's ruling, *see Houston v. Brown*, 221 Or App 208, 190 P3d 427 (2008), and the case therefore is not moot, *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993) (a case is not moot if the decision of the court will have a practical effect on the parties); *cf. Joint Council of Teamsters #37 v. BOLI*, 168 Or App 398, 11 P3d 247, *rev den*, 331 Or 429 (2000) (that determination might affect litigation possibly to be filed in the future does not avoid mootness).

race are placed with a wagering pool in which the participants are wagering with each other and not against the operator." ORS 462.010(8).[2]

ORS 462.700 provides that, in addition to the mutuel wagering authorized at the race meet "upon the premises of a race course," a race meet licensee may conduct off-race course mutuel wagering in accordance with ORS 462.700 to 462.740 and the Oregon Racing Commission rules. ORS 462.710(1) provides that the commission may authorize "off-race course mutuel wagering"

"(a) [o]n races held at the licensee's race course; or

"(b) [o]n races held at race courses outside this state."

The commission is authorized and required to adopt administrative rules implementing its authority to license off-race course mutuel wagering. ORS 462.250(6); ORS 462.270(3); ORS 462.740. In OAR 462-110-0010(15), the commission has defined "off-track wagering" as "[p]ari-mutuel wagering conducted on a race at a location other than the racecourse where the race is actually held."

ORS 462.720(1) sets forth the requirements for the "pooling" of wagered moneys in off-race course mutuel wagering. It provides, in part:

"All moneys wagered in off-race course mutuel wagering *on races held at race courses in this state shall be included in the computation of the mutuel pool for that race at the race course.* Subject to rules adopted by the Oregon Racing Commission and upon application of the race meet licensee, the commission may authorize:

"(a) Moneys wagered in off-race course mutuel wagering *at locations outside this state on races held at race courses in this state to be included in the computation of the mutuel pool for the race at the Oregon race course.*

"(b) Moneys wagered in off-race course mutuel wagering *at locations in this state on races held at race courses*

---

[2] "Mutuel" is short for "pari-mutuel," a system of betting in which all players have a mutual stake in the outcome. The two terms are used interchangeably in the statutes. *Compare* ORS 462.010(12) ("mutuel"), *with* ORS 462.145 ("pari-mutuel").

*outside this state to be included in the computation of the*
*mutuel pool for the race at the race course."*

(Emphasis added.)

    With the foregoing regulatory framework in mind,
we turn to the facts of this case, which we draw from the find-
ings contained in the commission's final order. Since 2001,
MEC Oregon has operated Portland Meadows, a horse racing
facility in Portland, under a race meet license granted by the
commission. The current race meet license requires MEC
Oregon to run 60 days of nine races each at Portland
Meadows. Those are "live" days, when races are actually
run on the Portland Meadows track. On live days, patrons
at Portland Meadows may place wagers on (1) the races
that will be run on the Portland Meadows track that day,
(2) races that are simulcast[3] from other venues, and
(3) games offered on a small number of video lottery termin-
als (VLTs) that are located at the facility with permission of
the Oregon Lottery Commission. On "dark" days, when
Portland Meadows does not offer live racing, patrons at the
track may still wager on races simulcast from other venues
and may play the VLTs.

    The "totalizator," or "tote," is an electronic system
used by petitioner to facilitate mutuel wagering. It consists of
a network of computers and wagering terminals linked by
modems and a frame-relay system, which electronically com-
bines wagers into "pools." When a wager is entered into the
system, based on pool totals, the totes record and display
changes in the betting patterns and recalculate mutuel odds
and projected payoffs in timed intervals. A totalizator facili-
tates wagering on horse races because it allows complex
wagers beyond simple bets like win, place, and show.

---

[3] OAR 462-110-0010(28) defines "simulcast" and "simulcasting" as follows:

    "(a) Live audiovisual electronic signals emanating from a licensed race
meeting and transmitted simultaneously with the running of the racing events
at that meeting, and includes the transmission of pari-mutuel wagering odds,
amounts wagered and payoff on such events, and other racing programming
relating to the race animals or participants, or

    "(b) Such other form of electronic signals of animal racing as is approved
by the commission."

In its order, the commission described the totalizator's ability to facilitate different types of mutuel wagers:

"As totalizators became more powerful, the forms of wagers that could be placed became more exotic.[4] Increasingly complex bets such as the daily double, then a quinella, then an exacta, then a trifecta and a super trifecta became available. Now there are numerous ways in which to place wagers on racing. * * * In some instances, like Choose 6, one wagerer might be betting on the first 6 races while another bettor is betting on the last 6. The pool is shared but they are not wagering on the same races. In some instances, no one wins the pool and the pool is carried over. It is possible that there might be only one wagerer eligible for the carryover pool. However, he or she is wagering against people who have wagered on that offering in the past. Wagering in Oregon is permitted on races all over the world. Some of those races are shown after they actually ran because they ran at times that would be in the middle of the night in Oregon. Some of those races are never shown, but betting on them is lawful. There are also 'futures' where a bettor places a wager on a horse in a future event not knowing that the horse will make it there. Such is the case for the three month Kentucky Derby future. Three months before the derby the names of 23 horses plus the 24th as the ubiquitous 'all' are given. The bettor places a bet, including on 'all,' not knowing who that horse is. No one knows whether the horses selected will make it to the derby, who will ride it or who the trainer will be. Nevertheless, the pool is frozen at a finite point in time long before the race is ever run and the bettor either wins or loses at the future point in time."

A bettor may try to determine which horse has a better chance of winning a race by using various methods of "handicapping." There are up to 90 handicapping factors that a bettor might consider, and that information might be available to the bettor through publications, such as the Daily Racing Form, which are compiled by third-party vendors.

Currently, to place a bet on a horse race at Portland Meadows, a bettor may use one of two methods: (1) the bettor may go to the mutuel clerk and place a bet; or (2) the bettor

---

[4] An "exotic" wager is "[a]ny single wager where three or more separate wagering interests are required to be selected." OAR 462-110-0010(8).

may use one of the self-service terminals made by AmTote, one of four totalizator companies in the United States. A bettor using an AmTote terminal places money or a voucher into the terminal and makes a wager. After the wager is placed on the AmTote terminal, the computer network transmits the bet to the tote hub, in Maryland. There, the central tote calculates the percentage due the house off the top of the wager and divides the rest of the wager among the pools that are being played. If the bettor wins and wishes to cash out, the bettor receives a voucher, which can be taken to a mutuel clerk, who pays the customer. The terminal does not dispense cash and is not a stand-alone gaming device. The AmTote terminal, unlike a slot machine, does not function independently, without being linked to the totalizator network.

MEC Oregon would like to add AmTote's Thoroughbred Mania terminals as a third wagering option for patrons at Portland Meadows. Thoroughbred Mania is a game based on a video library of 300,000 *previously run* official races, 20,000 of which are in use at any one time. To qualify for inclusion in the library, the race must have had a field of 10 horses and it must have been run at an official track with official results.

Thoroughbred Mania is played on a separate machine from the self-service terminals currently in operation at Portland Meadows. The Thoroughbred Mania terminal includes a video display, a touch-responsive interactive screen, and a built-in printer. There are $.25 and $1 wagers on Thoroughbred Mania machines. To play, the bettor places cash or a betting voucher into the machine and selects a wager amount. The bettor has six ways to win, corresponding to Win, Quinella, Exacta, Trifecta and Pick N, and other wagers which are currently approved by the commission, and is automatically included in six wagering pools which consist in part of wagers from other bettors who are betting on different races. For an additional payment, the bettor can wager on the outcome of a designated number of separate races and be placed in a pool consisting of that bettor's wager and wagers from other players betting on the outcome of a designated number of consecutively played separate races.[5] The

---

[5] For example, Thoroughbred Mania typically offers "Pick 4" wagering, which means that the bettor must pick the winner of four consecutive races that are

Thoroughbred Mania wagerer plays against other wagerers who are also playing Thoroughbred Mania, although the other wagerers may not be betting on the same race. However, the six automatic pools and two optional pools are the same for all bettors wagering on Thoroughbred Mania.

When a Thoroughbred Mania wager goes into the machine, one of the 20,000 previously run races currently in play is randomly selected from the video library and assigned to that terminal. Along with the historic race comes some, but not all, of the handicapping information that would have been available in the Daily Racing Form when the race was live, so that the bettor can make an informed pick, but the name of the horse, jockey, and trainer are not available. The bettor then picks the first, second, and third place horses. After the bet is placed, the identity of the race and competing horses are revealed, and the video of the actual race is played on the terminal. The first bettor to win one of the pools takes the entire pool. If the bettor wins, the bettor receives a credit for the largest pool in which the bettor participated. The bettor can either bet some or all of his or her accumulated credits on the next race to be replayed or "cash out" and receive a payment in the amount of credits accumulated. If the bettor loses, each pool in which the bettor participated is carried over until someone else betting on a different race wins a particular pool.

Thoroughbred Mania terminals differ in physical appearance from the self-service terminals used for placing mutuel wagers on other races at Portland Meadows, but the wager is placed in the same way and goes through a similar process: Money or a voucher placed in the terminal goes through the computer network and makes its way to the tote hub. The central tote calculates the percentage due the house and puts the rest of the bet in the pools being wagered on and a voucher is created. If the bettor wins one of six pools that are offered in the race, the terminal will either dispense a voucher or give the bettor the option to bet on another race. The terminal does not dispense money.

---

selected by the machine. The four consecutive races are different for each player whose wager contributes to the pool.

■     MEC Oregon sought to include Thoroughbred Mania in its race meet license. The commission denied the request, determining—among other conclusions—that Oregon law only allows mutuel racing on live races and that Thoroughbred Mania is not a form of mutuel wagering and does not involve live racing. MEC Oregon requested a hearing, and an administrative law judge (ALJ) for the Office of Administrative Hearings held a hearing and determined in a proposed order that the commissioner should allow Thoroughbred Mania at Portland Meadows.

■■     The commission reconsidered the ALJ's order and, pursuant to ORS 183.650(2) and (3), modified the proposed order's findings and conclusions. In the end, the commission rejected MEC Oregon's request to amend its license to include Thoroughbred Mania on six grounds, including that Thoroughbred Mania is not "mutuel" wagering within the meaning of the statute and that, even if that were not the case, the game is not the type of mutuel wagering that the statute permits because the statute does not encompass wagers on past races. The commission explained:

> "The authority vested in the Racing Commission to allow off-track wagering is broad, but it is not without limits. Specifically, that authority does not include the authority to authorize wagering on races run in the past at off-track locations.

> "ORS 462.700 authorizes the Commission to allow a licensee to 'conduct off-course mutuel wagering.' For the reasons set forth in the previous section, the Commission concludes that Thoroughbred Mania is not mutuel, and is not statutorily authorized. The Commission further concludes that even if Thoroughbred Mania were mutuel, the fact that the races are historical events would preclude the Commission from licensing the wager.

> "In reaching this conclusion, the Commission acknowledges * * * that nothing in ORS 462.700 through ORS 462.740 explicitly prohibits wagering on past events. However, it is also true that nothing in those statutes permits such wagers. The Commission's task in interpreting the statutes is to give effect to the underlying legislative intent. To that end, the Commission is obligated to consider statutory text in context, and to resolve remaining ambiguities

through recourse to legislative history. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The context for ORS 462.700 through 462.740 indicates that wagers on past events cannot be licensed.

"The strongest contextual indicator comes from ORS 462.720. As initially enacted, that statute required all money wagered within Oregon on a particular race to go into the same pool. Oregon Laws 1987, ch 913, § 4. Wagers on historical races could not comply with that requirement, because bettors can be betting on the same race hours, days, months, years or decades apart, requiring multiple pools for the same race. This context is a clear indication that the legislature did not intend for the Commission's authority to license off-track wagering to extend to wagers on past events. Changes to ORS 462.720 have permitted different pooling treatment with respect to some races, but neither the changes nor the legislative history indicate any intention to allow wagers on past events."

MEC Oregon seeks review of the commission's final order. According to MEC Oregon, the commission erred in concluding that the law does not permit wagering on past races. It relies on essentially two arguments in support of that contention. First, it notes that, although it is true that nothing in the statutes explicitly says that wagering on past events *is* permitted, it is also true that nothing in the statutes explicitly says that wagering on past events is *not* permitted. Second, it notes that, in at least one instance, ORS 462.125(1) refers to "*live* races" under a license; according to MEC Oregon, that permits the inference that, when other statutes say nothing one way or the other about whether races must be live, the omission was intentional, and the legislature may be understood implicitly to have intended that races that are not live may be the subject of lawful wagers.

We begin by noting that ORS 462.270 provides, in part:

"(2) The commission shall be the sole judge of whether or not a race meet shall be licensed. The application for a race meet license shall specify the duration of each race meet, the number of race days the race meet shall continue and the number of races per day. The commission, in its sole

discretion, is authorized either to accept or reject any application for a race meet license, and the decision of the commission is a final order which can be contested only on the basis that the commission abused its discretionary authority."

Thus, our review of the commission's order denying the requested amendment to the license ordinarily is for an abuse of discretion. To the extent, however, that the commission's decision rests on its interpretation of nondelegative statutory terms, we review the commission's interpretation as a matter of law. *See* ORS 183.482(8)(a); *Vickers/Nelson & Assoc. v. Environ. Quality Comm.*, 209 Or App 179, 184, 148 P3d 917 (2006). In reviewing the commission's interpretation of the relevant statutes, our task is to ascertain what the legislature that enacted the statutes intended, taking into account the text of the statutes in context and, as appropriate, their enactment history and other aids to construction. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009).

In this case, the commission's authority to permit off-race course mutuel wagering—whether the race takes place in Oregon or outside the state—is limited to wagering "to be included in the computation of the mutuel pool for the race at the race course." ORS 462.720(1)(b). As the commission correctly noted, the statute originally provided that

"[a]ll moneys wagered in off-course mutuel wagering on races held at race courses in this state shall be included in the computation of the mutuel pool for that race at the race course. All moneys wagered in off-course mutuel wagering on races held at race courses outside this state shall be held and computed in a mutuel pool for that race administered by the race meet licensee."

Or Laws 1987, ch 913, § 4. Clearly, under that version of the statute, whether the off-race course wagering was placed on a race that occurred in Oregon or somewhere else, all the money wagered on "that race" had to be placed in a single pool, at the same time. As the commission correctly observed, the statute did not permit repeated wagering on the race days, months, or years later.

The wording of the statute was altered by the legislature in 1991 to its current form. Nothing in that current

wording suggests that the legislature intended to alter the substance of the statute's requirement that off-race course wagering be limited to live races. If anything, the wording is clearer on that point. It unambiguously requires that moneys wagered in off-race course mutuel wagering must be included in the mutuel pool for the race "*at the race course*" where the race takes place, *i.e.*, the wagering pool for the live race.

Thoroughbred Mania does not comply with that statutory requirement. The game is based on historic races. There are no mutuel pools for the specific races. Instead, the pool consists of players betting on any of 20,000 different races that took place in the past at various times and places. Thus, there are no mutuel pools for the races *at the race course*, as ORS 462.720(1)(b) requires.

■   MEC Oregon's reliance on the single instance in which a related statute refers to "live races" simply cannot be reconciled with the wording of ORS 462.720(1)(b). It should be recalled that the rule of negative inference on which MEC Oregon relies is just that—a rule of permissible *inference* only. As such, it gives way to other, more direct, and contrary evidence of legislative intent. *See Colby v. Gunson*, 224 Or App 666, 671-72, 199 P3d 350 (2008) (maxim (*expressio unius est exclusio alterius*) "corroborates, rather than supplies, meaning to a statute"); *State v. Robison*, 202 Or App 237, 242, 120 P3d 1285 (2005) (the fact that the legislature employed certain phrasing in one statute, but not another, is not conclusive).

MEC Oregon complains that, if the statute is read according to its literal terms to require that all off-race course mutuel wagers be placed in the pool for the live race at the race course, then there are other games that are currently approved by the commission that do not satisfy that requirement. On this record, we have no way of knowing whether that is so. More importantly, even if that were the case, it would not matter. The question before us is *the legislature's* intentions in enacting the relevant statutes—specifically, whether Thoroughbred Mania is a type of off-race course mutuel wager that is permitted by the pertinent statutes, not whether other games authorized by *the commission* so qualify.

Because we conclude that the pertinent statutes permit the commission to authorize off-race course mutuel wagering only on live races, we conclude that the commission properly rejected MEC Oregon's request to include Thoroughbred Mania in its race meet license. We reject without discussion MEC Oregon's contention that the commission erred in making findings that were different from the findings of the ALJ.

Affirmed.