RENDERED: SEPTEMBER 24, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0630-TG

THE FAMILY TRUST FOUNDATION OF                 APPELLANT
KENTUCKY, INC., D/B/A THE FAMILY
FOUNDATION


|  | ON APPEAL FROM FRANKLIN CIRCUIT COURT |
|---|---|
| V. | HONORABLE THOMAS D. WINGATE, JUDGE |
|  | NO. 10-CI-1154 |


THE KENTUCKY HORSE RACING                      APPELLEES
COMMISSION; THE KENTUCKY
DEPARTMENT OF REVENUE; KEENELAND
ASSOCIATION, INC.; TURFWAY PARK, LLC;
PLAYERS BLUEGRASS DOWNS;
APPALACHIAN RACING, LLC; KENTUCKY
DOWNS, LLC; ELLIS PARK RACE COURSE,
INC.; LEXINGTON TROTS BREEDERS
ASSOCIATION, LLC AND CHURCHILL
DOWNS INCORPORATED


**OPINION OF THE COURT BY JUSTICE VANMETER**

**REVERSING AND REMANDING**

For the second time, this case is before this Court for consideration of

the Kentucky Horse Racing Commission's regulations as applied to historical

horse racing, and, on this occasion, the Franklin Circuit Court's determination

that the Encore system constitutes a "pari-mutuel system of wagering."

Because we hold that the Encore system does not create a wagering pool

among patrons such that they are wagering among themselves as required for

pari-mutuel wagering, the trial court misapplied the applicable regulation as a

matter of law.  We therefore remand this matter to the Franklin Circuit Court for entry of a judgment consistent with this opinion.

## I.     Factual and Procedural Background.

The procedural history of this case is found in our previous opinion, *Appalachian Racing, LLC v. Family Trust Found. of Kentucky, Inc.*, 423 S.W.3d 726 (Ky. 2014).  In summary, the Commission, the Department of Revenue and eight horse racing associations sought judicial approval for wagering on historical horse racing, pursuant to Commission regulations.  810 KAR[1] 1:001(30), 810 KAR 1:011, 810 KAR 1:120.  As described by Justice Venters, writing for the Court,

> One such device, similar in appearance to a slot-machine, is a patented product marketed under the name "Instant Racing."[2] The bettor inserts money or its equivalent into the Instant Racing terminal and then chooses a horse identified by a number.  The terminal then displays a video recording of the race for the bettor to watch, or, as the name "Instant Racing" implies, the bettor may forego the excitement of the actual race by opting to see immediately the results of the race and the outcome of his wager. Bettors are not given information from which they might identify the specific time and place of the actual running of the race, or the identity of the horse, but some statistical data regarding the horses is provided for bettors who wish to place their bets with some degree of deliberation.

423 S.W.3d at 730.  The Family Foundation of Kentucky, Inc. ("Foundation") was permitted to intervene.  It challenged both the validity of regulations and the premise that wagering on historical horse races was truly pari-mutuel wagering as mandated by KRS[3] 230.215 and 230.361.  Significantly, the trial

---

[1] Kentucky Administrative Regulations.

[2] This device is not in use by any Kentucky racing association.

[3] Kentucky Revised Statutes.

court denied the Foundation any opportunity for discovery at that time. *Id.* at 731–32.

Our prior opinion addressed four issues.[4] First, justiciability of the proceeding and KRS 418.020. 423 S.W.3d at 732–35. We held that the Foundation's intervention cured any infirmities on this issue. *Id.* at 735. Second, the Commission's authority to license and regulate pari-mutuel wagering on historical horse racing. *Id.* at 735–38. Within our discussion of this aspect of the case, we rejected the Foundation's arguments that the legislature had not authorized the Commission to permit wagering on historical horse racing, and that wagering on a terminal could not qualify generally as "pari-mutuel wagering." As to the latter argument, we noted that KRS Chapter 230 does not provide a definition of pari-mutuel wagering and looked to the definitions in the federal Interstate Horse Racing Act, 15 U.S.C. § 3002(13) and Kentucky's common law, specifically as stated in *Commonwealth v. Kentucky Jockey Club*, 238 Ky. 739, 747, 38 S.W.2d 987, 991 (1931). We held that the Commission's regulations defining pari-mutuel wagering, as set forth in 810 KAR 1:001(48), 811 KAR 1:005(54), and 811 KAR 2:010(68), were "consistent with the references to pari-mutuel wagering in KRS Chapter 230." 423 S.W.3d at 737–38. Third, the Department of Revenue's collection of a tax on historical horse racing. *Id.* at 738–41. We held that the Department exceeded its authority in amending its regulation. *Id.* at 741. And fourth, although the

---

[4] The first and third issues in our prior opinion are not germane to this appeal but are included for sake of completeness.

regulations allowing for pari-mutuel wagering on historical horse racing may be valid, whether the operation of historical horse racing as contemplated by the respective horse racing associations constituted a pari-mutuel form of wagering. *Id.* at 741–42. As to this final issue, we remanded the case to the trial court to permit the Foundation to conduct discovery and present proof.

After four years of discovery, in January 2018, the trial court conducted a hearing with respect to the Encore system[5] in use by three associations, Kentucky Downs, LLC, Ellis Park Race Course, Inc., and the Lexington Trots Breeders Association, Inc. (collectively the "Association Appellees"). The trial court then entered an extensive Opinion and Order. It recounted the history of the case and provided a four-part definition of pari-mutuel wagering, based on 810 KAR 1:001(48):

1) A system or method of wagering approved by the Commission;

2) In which patrons are wagering among themselves and not against the association;

3) Amounts wagered are placed in one or more designated wagering pools; and

4) The net pool is returned to the winning patrons.

*Kentucky Horse Racing Comm'n v. Family Trust Found. of Kentucky, Inc.*, No. 10-CI-02254, slip op. at 6, Franklin Circ. Ct. (Oct. 24, 2018).

The trial court made the following factual findings. The operation of the Encore or Exacta system was approved by the Commission. It uses a triple

_____

[5] The Encore system is also known as the Exacta system. The Instant Racing terminal that was the ostensible focus of the prior opinion is no longer used, apparently, by any Kentucky racing association.

4

race method, by which the system randomly selects three historical horse races. The three races are presented to the patron, who is "given the opportunity to handicap the race or choose a built-in function . . . which uses the 'off odds' order of the horses." *Id.* at 14. "The 'off odds' are the pari-mutuel odds that represent the amount a patron will win if his or her chosen horse wins, as set at the time the horses left the starting gate." *Id.* The patron places his or her wager, from which the association's "takeout" amount is deducted. KRS 230.3615; 810 KAR 1:001 § 1(75). After the patron selects the order of finish, digital replays of the races' final furlong are displayed, showing the order of finish. The patron's selections and order of finish are compared to determine the patron's payout, if any.

The trial court noted that the initial seed pool, also known as the "threshold," is provided by the association. 810 KAR 1:001 § 1(33).[6] It found, based on testimony, that "if the balance of the pool is above the threshold, the winning patron will receive either par or all of the net pool[7] depending on the accuracy of the patron's selections. If the amount of the pool is below the threshold, the winning patron receives a guaranteed minimum amount according to the games' rules." The trial court found, based on testimony, that "[a]ll payouts on winning wagers come from the pool, not any separate account of the [a]ssociation[,]" and that "the net pool is going to be paid out many times

---

[6] This definition defines "[i]nitial seed pool" as "a nonrefundable pool of money funded by an association in an amount sufficient to ensure that a patron will be paid the minimum amount required on a winning wager on an historical horse race."

[7] The Commission, by regulation, defines "net pool" as "the total amount wagered less refundable wagers and takeout." 810 KAR 1:001 § 1(44).

over." Additionally, the daily wagering reports demonstrate that the pools fluctuate based on the outcomes of patrons' wagers. Finally, the trial court noted the testimony of the Commission's witness, Richard LaBrocca, that patrons' wagers into the same pool affected following wagers by either increasing or decreasing the pool.

Included among the trial court's findings of fact are the following conclusions of law:

> 92. Pari-mutuel wagering does not require patrons to wager on the same horse races, nor does it require reciprocity among patrons, or for a pool to remain open for a specified period of time.

> 93. Similar to the Exacta System design, it is typical in pari-mutuel wagering for pools to be paid out to various patrons over time.

Slip op. at 18.

The trial court concluded that the Encore system constituted a pari-mutuel system of wagering, approved by the Commission and meeting the elements of 810 KAR 1:001 § 1(48).

The Foundation appealed. We accepted transfer from the Court of Appeals, as this matter involves "great and immediate public importance." CR[8] 74.02(2).

## II. Standard of Review.

After our first opinion, the Franklin Circuit Court, on remand, permitted discovery and held a bench trial, following which it entered an Opinion and Order which contained its factual findings. Our standard of review for such a

---

[8] Kentucky Rules of Civil Procedure.

6

proceeding is clear: "[f]indings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."  CR 52.01.  On the other hand, a trial court's conclusions of law, *i.e.*, the application of the law to those facts, are reviewed de novo.  *Payton v. Commonwealth*, 327 S.W.3d 468, 471-72 (Ky. 2010).

### III.    Analysis.

Our prior opinion summarized both federal law and Kentucky common law and set out two of the essential elements of pari-mutuel wagering: "patrons are wagering among themselves and not against the association," and "amounts wagered are placed in one or more designated wagering pools."  As we have reviewed this case, the factual findings and arguments of counsel, two aspects of the Encore System fail to constitute "pari-mutuel wagering."

Both the federal statutory definition of pari-mutuel wagering and the Kentucky common law definition refer to a discrete, individual event on which wagers are made.  *See* 15 U.S.C. § 3002(13) (defining "pari-mutuel" as "any system whereby wagers with respect to the outcome of **a horserace** are placed with, or in, a wagering pool") (emphasis added); *Commonwealth v. Ky. Jockey Club*, 238 Ky. 739, 747, 38 S.W.2d 987, 991 (1931) ("French pool" or "Paris Mutual" definition includes "the effect of which is that all who buy pools on **a given race** bet among themselves") (emphasis added).[9]  The Commission's

---

[9] *Ky. Jockey Club's* definition of "French pool" was quoted from *City of Louisville v. Wehmoff*, 116 Ky. 812, 846, 79 S.W. 201, 201 (1904).  *Wehmoff*, in turn, cites an earlier case, *Commonwealth v. Simonds*, 79 Ky. 618 (1881) which includes the first Kentucky description of "French pool" or "Paris mutual" as

regulations incorporate this understanding of a pool generated based on a discrete race. *See, e.g.,* 810 KAR 1:011 § 1(1) (providing "[t]he only wagering permitted on **a** live or historical horse race shall be under the pari-mutuel system of wagering[]"); 810 KAR 1:011 § 3(1) (providing "[w]agering on **an** historical horse race is hereby authorized and may be conducted in accordance with KRS Chapter 230 and 810 KAR Chapter 1[]") (emphasis added). The subsequent subsections of 810 KAR 1:011 similarly emphasize the wagering on "**an** historical horse race."

The Association Appellees argue that our previous conclusion, that the Commission's regulatory definition of pari-mutuel wagering is consistent with definitions established by Kentucky's common law and federal statute, constitutes law of the case and that we implicitly, if not explicitly, rejected the

---

> a small *machine*, containing the name of each horse to be run in a particular race written or printed on the side, and printed numbers placed on the inside of the machine, which, could be seen through holes in it. It is used by the owner or person operating it, and by those engaged in betting on horse-racing in this way:
>
> > The owner or operator sells the tickets for five dollars each; they bear numbers corresponding with the number given the horse on the machine, and by turning a crank or screw attached to the machine the betters are shown at once the number of tickets sold on each horse as each of said tickets is sold, so as to enable him to bet more intelligently and safely, and lessen the chances of disaster to himself.
> >
> > After the race is over, the machine is examined to see how many tickets have been sold, and those persons holding tickets on the winning horse get the amount of all the money received by the operator for all the tickets sold by him on all the horses that have run in the particular race, less five per cent, commission on the pool, which the operator of the machine retains for his services.

79 Ky. at 619. This earliest definition contained the essential elements of pari-mutuel wagering, which are unchanged in 140 years: patrons wagering on a **particular** race, creating the pool, and setting the odds, with the winners sharing the pool, less the pool operator's commission.

Foundation's argument. We disagree. As noted, both definitions we quoted referred to a discrete event, as opposed to multiple, disconnected, randomly-selected, historical horse races. The Commission's regulations repeatedly refer to a singular historical horse race. If the law of the case precludes an argument, it is that of the Association Appellees.

The trial court erred in its conclusion that "[p]ari-mutuel wagering does not require patrons to wager on the same horse races, nor does it require reciprocity among patrons." Without providing simultaneous access to one historical horse race to the same group of patrons, no pari-mutuel pool can be created among the patrons in which they are wagering among themselves, setting the odds and the payout. The testimony presented to the trial court disclosed that odds are established by the "off odds" as set at the time the horses left the starting gate. In other words, patrons wagering on randomly-generated historical horse races within the Exacta System are **not** establishing odds with other patrons wagering on the same race(s).[10] Emphatically, such patrons are not wagering among themselves as required by pari-mutuel wagering.

To the extent that our prior opinion is read by some to suggest that the random generation of multiple historical horse races with patrons placing wagers on different races qualifies as pari-mutuel wagering, that reading is simply wrong. To be clear, pari-mutuel wagering requires that patrons generate

---

[10] *See MEC Oregon Racing, Inc. v. Oregon Racing Comm'n*, 225 P.3d 61, 67 (Or. 2009) (noting lack of mutuel pools for specific races since players bet on any of 20,000 different races).

9

the pools based on wagering on the same discrete, finite events.[11] Only in that way are patrons "wagering among themselves" and setting the odds and the payouts, the exceptions being possible minimum payouts and minus pools. KRS 230.3615.

Furthermore, and as the Commission's regulations appear more in focus in this proceeding, the fact that "initial seed pool" is furnished by the association impermissibly involves an association in creating the pool. The betting pools are required to be established only by the patrons. And, as found by the trial court, based on testimony, a possibility exists that one patron could win all of the net pool, which would then require the association to step back in and replenish the seed pool. At such points, the pools are not created by the patrons as required by pari-mutuel wagering.

The foregoing mandates reversal of the Franklin Circuit Court's Opinion and Order. But we are compelled to note an additional matter. The legislature created the Commission and expressed that the purpose and intent of KRS Chapter 230 "in the interest of the public health, safety, and welfare, [is] to vest in the racing commission forceful control of horse racing in the Commonwealth with plenary power to promulgate administrative regulations prescribing conditions under which all legitimate horse racing and wagering thereon is conducted in the Commonwealth[.]" KRS 230.215(2). Notwithstanding this broad remit, the Commission, like all administrative agencies, may not exceed

---

[11] This requirement would thus authorize Pick-4 and Pick-6 type wagers whereby the possibility exists for carryover pools to the following race day.

10

its statutory authority. *GTE v. Revenue Cabinet*, 889 S.W.2d 788, 792 (Ky.1994). Thus, an agency may not assume any power not expressly granted to it by the general assembly. *Id.* An administrative body's powers are defined and limited by the agency's enabling statute. *Public Serv. Comm'n v. Attorney Gen.*, 860 S.W.2d 296, 297–98 (Ky. App. 1993).

The Commission's powers with respect to pari-mutuel wagering are indeed broad, but the only legal wagering is pari-mutuel as authorized by KRS Chapter 230. KRS 436.480. We note the legislative governance over pari-mutuel wagering. Historically, pari-mutuel wagering in Kentucky was permitted "only upon the licensed premises and on the dates and hours for which racing has been authorized by the commission." *See,* e.*g.*, KRS 230.361(1) (1980) (wagering on thoroughbred races); KRS 230.385(1) (1982) (wagering on harness races); KRS 230.447(1) (1982) (wagering on quarter horse or Appaloosa races).[12] In 1980, the legislature enacted KRS 230.3611, prohibiting any thoroughbred pari-mutuel pool "where it is required to select more than two (2) horses."[13] Beginning in 1982, however, presumably

---

[12] Prior to 1992, KRS Chapter 230 provided for three separate racing commissions. In that year, the legislature created one body, the Kentucky Racing Commission, to administer all racing, irrespective of breed. Act of Mar. 30, 1992, ch. 109, 1992 Ky. Acts 267–92.

[13] This statute served to limit much exotic wagering, except daily double (wagering on the first-place finishers in the first two races of an association's daily race card) and an exacta wager (wagering on the first- and second-place finishers, in order, of a given race). The statute essentially codified the Kentucky State Racing Commission's action, in November 1979, of abolishing exotic wagering, except the daily double. Dave Koerner, "No Racing on Sunday, panel rules; Commission kills 'exotic' wagering," *Courier-Journal*, Mon. Nov. 9, 1979, p. 78. Churchill Downs challenged the constitutionality of the statute in Franklin Circuit Court in 1984 since harness racing had no such prohibition. "Churchill to offer Pick-Six wagering; Injunction paves the way for move," *Courier-Journal*, Wed., July 18, 1984, p. 16. KRS

responding to requests from the horse industry, the legislature began to loosen the requirements for permissible pari-mutuel wagering. In that year, the legislature amended KRS 230.361 to permit a licensed association to conduct pari-mutuel wagering on thoroughbred racing conducted at another Kentucky licensed association, and on "special event races" in other states or foreign countries as determined to be of national or international significance or interest to permit interstate wagering.[14] Act of March 23, 1982, ch. 100 § 6(2), 1982 Ky. Acts 183, 186. The legislature, thus, set the policy to permit expansion of pari-mutuel wagering: intertrack wagering, simulcasting, and interstate and international wagering. These pari-mutuel wagering innovations, as well as others, continue to be set forth in Kentucky statutes, *e.g.,* Interstate Racing and Wagering Compact, KRS 230.3761; simulcasting and intertrack wagering, KRS 230.377, 230.3771, 230.3773, 230.380; telephone account wagering, KRS 230.378. 230.379; use of credit card for wagering, KRS 230.379, and International Racing Hubs, KRS 230.775–230.780.

These statutes all refer to pari-mutuel wagering, which we addressed in this and our prior opinion. The legislature has never altered or changed the

---

230.3611 was repealed in 1988. Act of Apr. 10, 1988, ch. 376 § 13, 1988 Ky, Acts 1049, 1055.

[14] *See generally* Robert T. Garrett, "Plan brings off-track betting closer to reality: Horsemen reach tentative accord after talks with legislative leaders," *Courier-Journal,* Tue., Jan. 5, 1982, p. 1. The paper had reported in 1979 that Churchill Downs had reached an agreement with the New York Off-Track Betting Corp. to permit New York betting on the Kentucky Derby, Kentucky Oaks, and the Stepping Stone Purse. Dave Koerner, "Downs agrees to allow OTB wagers on Derby, 2 other races," *Courier-Journal,* Wed., Apr. 25, 1979, p. 43. Kentucky statutes at that time had no provisions limiting licensed association's permitting out-of-state wagering on its races.

definition of pari-mutuel wagering, whether it is referred to as combination, French, Paris mutuel or pari-mutuel pools. The Commission is charged with regulating pari-mutuel wagering. But without positive legislative action and sanction, it has no authority to create from whole cloth and to approve a wagering pool in which each patron is wagering on a different event or set of events. Such a wagering pool by no means can be considered a pari-mutuel wagering pool in which patrons, as among themselves, are setting the betting odds and payout.

We acknowledge the importance and significance of this industry to this Commonwealth. We appreciate the numerable economic pressures that impact it. *Appalachian Racing*, 423 S.W.3d at 730; *see generally* Bennett Liebman, *Pari-Mutuels: What Do They Mean and What Is at Stake in the 21st Century*, 27 Marq. Sports L. Rev. 45, 45–46 (2016) (noting declining popularity of horse racing and dropping attendance and pari-mutuel handle). If a change, however, in the long-accepted definition of pari-mutuel wagering is to be made, that change must be made by the people of this Commonwealth through their duly-elected legislators, not by an appointed administrative body and not by the judiciary.[15]

---

[15] We recognize that the legislature has taxed "pari-mutuel wagering on historical horse races," KRS 138.510; defined "historical horse race," KRS 138.511(9)(a), and exempted "[d]evices dispensing or selling combination or French pools on historical races at licensed, regular racetracks as lawfully authorized by the Kentucky Horse Racing Commission" from the definition of a prohibited "gambling device." KRS 528.010(5)(d)2. This latter statute was enacted in 2015. Act of Mar. 15, 2015, ch. 5, § 1, 2015 Ky. Acts. The same bill, however, also provided,

**No provision of this Act shall be construed as a recognition or finding concerning whether the operation of wagering on historical horse races constitutes a pari-mutuel form of wagering** or concerning

## IV.    Conclusion.

The Franklin Circuit Court's Opinion and Order is reversed, and this matter is remanded to that court for entry of a judgment consistent herewith.

All sitting.  Minton, C.J.; Hughes, Lambert, Nickell and Wright, JJ., concur.  Keller, J., concurs by separate opinion.

KELLER, J., CONCURRING: In good faith, the Commission initiated this action in circuit court to assure themselves, and the businesses they regulate, that the proposed operations fell under KRS 436.480's exemption to KRS Chapter 528. Our holdings in *Appalachian Racing* were limited to affirming the Commission's statutory authority to promulgate regulations regarding historical horse racing if such racing was pari-mutuel, but we lacked a sufficiently developed record to determine whether any specific system was pari-mutuel. As to the second question, the trial court undertook a yeoman's task with the limited guidance we provided. Ultimately, however I agree with the majority that the operation of the Exacta System is not pari-mutuel as defined in the common law.

---

the legality of wagering on historical horse races, the devices upon which wagering on historical horse races is conducted, or the gaming system.

*Id.* at § 2 (emphasis added).  We believe this significant in that the legislature expressly disclaimed alteration of the definition of pari-mutuel wagering.  We find support in the statutory reference to "combination or French pools" which was explicitly defined in *Kentucky Jockey Club* as "[i]n French pool the operator of the machine does not bet at all.  He merely conducts a game, which is played by the use of a certain machine, the effect of which is that **all who buy pools on a given race bet as among themselves**; the wagers of all constituting a pool going to the winner or winners."  238 Ky. at 747, 38 S.W.2d at 991 (emphasis added).

14

COUNSEL FOR APPELLANT:

Stanton L. Cave
The Law Office of Stan Cave


COUNSEL FOR APPELLEE,
THE KENTUCKY HORSE RACE
COMMISSION:

Benjamin Adam Long
Office of Legal Services

Jacob Clark Walbourn
Public Protection Cabinet

Jennifer Marie Wolsing
Kentucky Horse Racing Commission

COUNSEL FOR APPELLEE,
THE KENTUCKY DEPARTMENT
OF REVENUE:

Richard W. Bertelson III
Office of Legal Services for Revenue

COUNSEL FOR APPELLEES,
KEENELAND ASSOCIATION, INC.;
TURFWAY PARK, LLC;
PLAYERS BLUEGRASS DOWNS, INC.
AND APPALACHIAN RACING, LLC:

Samuel D. Hinkle IV
William M. Lear, Jr.
Shannon Bishop Arvin
Brad Keeton
Stoll Kennon Ogden PLLC

COUNSEL FOR APPELLEES,
KENTUCKY DOWNS, LLC;
ELLIS PARK RACE COURSE, INC.;
AND LEXINGTON TROTS BREEDERS
ASSOCIATION, LLC:

William A. Hoskins III
Jay Edward Ingle
Christopher Flynn Hoskins
Jackson Kelly PLLC


COUNSEL FOR APPELEE,
CHURCHILL DOWNS INCORPORATED:

Sheryl G. Snyder
Jason Patrick Renzelmann
Frost Brown Todd, LLC

16